IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID R. CUNNINGHAM, JEROME BROWN, MARCELLA EMERY, and RONALD EMERY, | : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 17-5102 |
| v. | : : | |
| CREDIT BUREAU OF LANCASTER COUNTY, INC., | : : : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Smith, J.                                                          November 20, 2018

The plaintiffs brought this action under the Fair Debt Collection Practices Act ("FDCPA") because they each received an allegedly materially deceptive and misleading debt collection letter from the defendant. The plaintiffs claim that the defendant's letters are materially deceptive and misleading because the defendant is falsely representing that it is a "credit bureau."

The defendant has now moved for summary judgment, with the motion presenting this court with a single question: Is the defendant indisputably a credit bureau, so that the use of the term "credit bureau" in its name does not make debt collection letters that include its logo materially false, deceptive, or misleading within the meaning of 15 U.S.C. § 1692(e)? According to the plaintiffs, a genuine issue of material fact exists as to whether the defendant is a credit bureau. In the plaintiffs' view, although the defendant may have been a credit bureau in the past, it lost that status when it sold its credit reporting division to TransUnion in 2000, and its continuing use of the name "credit bureau" risks misleading debtors into believing that it has the power to adjust their credit scores or reports and report those changes to potential creditors. The defendant

responds that it is a consumer reporting agency ("CRA") under the Fair Credit Reporting Act ("FCRA")[1] and points to various sources which it claims establish that a CRA is indistinguishable from a credit bureau. The defendant further argues that the plaintiffs lack constitutional standing because they have not alleged an injury-in-fact within the meaning of Article III of the United States Constitution.

Given the number of contradictory definitions of the term "credit bureau" in modern parlance, the court concludes that a genuine issue of material fact exists as to (1) whether the defendant is a credit bureau; (2) if not a credit bureau, whether the use of the term "credit bureau" in its name in the debt collection letters the plaintiffs received was deceptive; and (3) if deceptive, whether that deception was material. The court further concludes that the plaintiffs have alleged a risk of intangible harm sufficient to confer constitutional standing under the Supreme Court's holding in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) and the Third Circuit's holding in *In re Horizon Healthcare Services Inc. Data Breach Litigation*, 846 F.3d 625 (2017). Therefore, the court denies the defendant's motion for summary judgment.

## I.     PROCEDURAL HISTORY

One of the currently named plaintiffs, David Cunningham, initiated this action by filing a complaint against the defendant, Credit Bureau of Lancaster County ("CBLC"), on November 13, 2017. Doc. No. 1. Before CBLC filed any response to the complaint, the plaintiff filed an amended complaint adding Jerome Brown as a co-plaintiff on December 7, 2017.

---

[1] The FCRA defines a CRA as:

> any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f).

Doc. No. 4. CBLC filed an answer and affirmative defenses to the amended complaint on December 21, 2017, asserting that, as a CRA, it also is a credit bureau, and the collection letters were therefore not deceiving. *See* Def. Credit Bureau of Lancaster County, Inc.'s Answer to Pls.' Am. Compl. at 1, 3, 4, 5, Doc. No. 7.

On March 29, 2018, the plaintiffs filed a second amended complaint, with CBLC's consent, adding Ronald Emery and Marcella Emery as co-plaintiffs. Doc. Nos. 17, 19. CBLC filed an answer and affirmative defenses to the second amended complaint on April 11, 2018, again asserting that it is a credit bureau because it is a CRA. *See* Def. Credit Bureau of Lancaster County, Inc.'s Answer to Pls.' Second Am. Compl. ("Def.'s Answer") at 1, 3, 4, Doc. No. 20.

CBLC filed the instant motion for summary judgment on July 12, 2018. Doc. No. 26. The plaintiffs filed a response in opposition to the summary judgment motion on August 2, 2018, and CBLC filed a reply in further support of the motion on August 9, 2018. Doc. Nos. 30, 31. The court heard oral argument on the motion on September 5, 2018. The motion for summary judgment is now ripe for adjudication.

## II. FACTUAL BACKGROUND AND SUMMARY OF ARGUMENTS

Each of the plaintiffs had an account placed in CBLC's collection division. *See* Def. Credit Bureau of Lancaster County, Inc.'s Statement of Material Facts ("Def.'s Facts") at ¶ 11, Doc. No. 26-1; Pls.' Responsive Statement to Def.'s Statement of Material Facts and Statement of Add'l Facts Precluding Summ. J. (hereinafter referred to as "Pls.' Resp." and "Pls.' Add'l Facts" where applicable) at 2, ¶ 11, Doc. No. 30-1. Each plaintiff received a debt collection letter from CBLC at some point between November 2016 and July 2017. *See* Def.'s Facts at ¶ 12; Pls.' Resp. at ¶ 12; Second Am. Compl. at ¶¶ 13–16. All of those debt collection letters included CBLC's logo at the top left corner of the page:



Credit Bureau
of Lancaster County, Inc.
COLLECTION DIVISION
PO Box 1271
Lancaster, PA 17608-1271

*See* Def.'s Facts at ¶ 13; Pls.' Resp. at ¶ 13; Second Am. Compl. at ¶¶ 13–17 and Exs. A–D; Def.'s

Answer at ¶¶ 13–17.

The history of CBLC's business is helpful to analyzing whether it currently is a credit

bureau. There is no dispute that CBLC has operated as a CRA under its current name since 1944,

nor is there any dispute that, since that time, CBLC has assembled and furnished consumer

background screening reports.[2] *See* Def.'s Facts at ¶¶ 1–2, 7–8; Pls.' Resp. at ¶¶ 1–2, 7–8.

Alongside its consumer reporting division, CBLC also operates the aforementioned collections

division, which seeks to collect debts on behalf of CBLC's clients. See Def.'s Facts at ¶ 10; Pls.'

Resp. at ¶ 10.

According to the plaintiffs, CBLC sold one portion of this consumer reporting division—

its credit reporting files and credit reporting contracts—to credit bureau TransUnion in

September 2000, and CBLC has not assembled or furnished credit reports on consumers since that

time. *See* Pls.' Add'l Facts at ¶¶ 2–6. Although a background screening report may include a

---

[2] According to the plaintiffs, whereas a "credit report" or "credit history" focuses on a consumer's credit history, a background screening report of the sort CBLC provides covers a broader range of information, such as an individual's "tenant and employment background." *See* Pls.' Add'l Facts at ¶¶ 3–4, 25–27.

consumer's credit report, the plaintiffs allege that CBLC purchases the report from TransUnion and itself plays no role in assembling the report. *See id.* at ¶ 3. Thus, in the plaintiffs' view, CBLC has not been a credit bureau since it sold that portion of its business in 2000.

At oral argument, CBLC did not dispute that it sold certain portions of its credit reporting business. However, CBLC avers that it retained aspects of its broader consumer reporting business and continues to provide background consumer screening reports today. *See* Def.'s Facts at ¶¶ 1–4. The plaintiffs agree that CBLC provides some form of consumer reporting, and thus the parties do not dispute that CBLC is a CRA under the FCRA. *See id.* at ¶¶ 1–2; Pls.' Resp. at ¶¶ 1–2. Rather, the parties' dispute centers on whether a CRA, by definition, also is a credit bureau. CBLC argues that the terms "credit bureau" and "CRA" are synonymous with one another; because the parties do not dispute that CBLC is a CRA, it follows that CBLC is a credit bureau. The plaintiffs, on the other hand, argue that while all credit bureaus are CRA's, not all CRA's are credit bureaus. The parties agree that there is no statutory definition of the term "credit bureau," and in turn point to various sources ranging from Federal Trade Commission ("FTC") commentary, case law, the U.S. Office of the Comptroller of the Currency's website, Federal Reserve guidance, and even dictionary.com, each of which offers a different view on the meaning of the term.

## III. DISCUSSION

### A. <u>Standard of Review – Motions for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute"). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (indicating that a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of

material fact exists and that a reasonable factfinder could rule in its favor"). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). Further, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe it," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B.    Article III Standing

As indicated above, CBLC argues that the plaintiffs lack standing insofar as "they have alleged a bare procedural violation divorced from any concrete harm and, thus, they have not satisfied the injury-in-fact requirement of Article III."  Def. Credit Bureau of Lancaster County, Inc.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 5, Doc. No. 26-2.  Under Article III of the Constitution, the judicial power "extends only to 'Cases' and 'Controversies.'"  *Spokeo v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting U.S. Const. art. III, § 2).  "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."  *Id.*

"[T]he 'irreducible constitutional minimum' of standing consists of three elements."  *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  The three elements are:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[.]  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly trace[able] to the challenged action of the defendant, and not th[e] result [of] the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560–61 (all alterations except first alteration in original) (internal citations, quotation marks, and ellipses omitted).

Here, the question is whether the plaintiffs have satisfied the first factor, the existence of a concrete and particularized injury.  To be "concrete," an injury must be "*de facto*; that is, it must actually exist, rather than being only abstract."  *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 272 (3d Cir. 2016) (citation and internal quotation marks omitted).  To be "particularized," an injury must "affect the plaintiff in a personal and individual way."  *Lujan*, 504 U.S. at 560 n.1.

The Supreme Court elaborated on what it means to suffer an injury sufficient for standing purposes in *Spokeo*. Specifically, the Court explored Congress' ability to define intangible harms as injuries for which individuals can seek judicial relief. *See* 136 S. Ct. at 1549–50. The Court recognized that "Congress is well positioned to identify intangible harms that meet minimum Article III requirements," and therefore "[t]he violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact." *Id*. at 1549. Where that is the case, "a plaintiff need not allege any *additional* harm beyond the one identified by Congress." *Id*. (citing *Fed. Election Comm'n* v. *Akins*, 524 U.S. 11, 20–25 (1998)). However, the Constitution still "requires a concrete injury even in the context of a statutory violation" and a "bare procedural violation, divorced from any concrete harm" cannot satisfy Article III. *Id*. (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) and *Lujan*, 504 U.S. at 572). To determine whether an intangible harm rises to the level of a concrete injury, courts consider both Congress' judgment in recognizing a statutory harm and whether the purported "harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American Courts." *Id*. (citing *Vt. Agency of Nat. Resources v. United States ex rel. Stevens*, 529 U.S. 765, 775–77 (2000)). A "risk of real harm" can amount to a concrete injury, even if that harm "may be difficult to prove or measure." *Id*. (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 298 (2013) and Restatement (First) of Torts §§ 569 (libel), 570 (slander *per se*) (1938)).

The Third Circuit applied the analysis in *Spokeo* to hold the plaintiffs had adequately alleged a risk of harm in *In re Horizon Healthcare Services Inc. Data Breach Litigation*, 846 F.3d 625 (2017) (hereinafter "*In re Horizon*"). In that case, the plaintiffs alleged that the defendant, a health insurance provider, violated the FCRA when two laptops containing the plaintiffs' unencrypted personal information were stolen from the defendant's headquarters. *See In re*

*Horizon*, 846 F.3d at 630. Although the plaintiffs had not alleged that anyone had used their stolen information, the Third Circuit nevertheless held they suffered a concrete injury where the plaintiffs alleged that they faced "an imminent, immediate, and continuing increased risk of harm from identity theft, identity fraud, and medical fraud." *Id*. at 634 (citation and quotation marks omitted). *Cf. Benali v. AFNI, Inc.*, Civ. A. No. 15-3605-BRM-DEA, 2017 WL 39558, at *7 (D.N.J. Jan. 4, 2017) (finding no standing where it was "undisputed that there was no risk that Plaintiff would pay" fee referenced in collection letter because he knew debt could not possibly be his).

Pursuant to *In re Horizon*, "[w]hen one sues under a statute alleging the very injury [the statute] is intended to prevent, and the injury has a close relationship to a harm … traditionally … providing a basis for a lawsuit in English or American courts, a concrete injury has been pleaded." *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017) (second alteration in original) (internal quotation marks and citation omitted). "[A] close relationship does not require that the newly proscribed conduct would give rise to a cause of action under common law. But it does require that newly established causes of action protect essentially the same interests that traditional causes of action sought to protect." *Id*. (internal quotation marks and citation omitted).

Here, there is no question that the plaintiffs' alleged injuries are particularized, because they each received letters addressed to them which were meant to collect their own debts. *See* Second Am. Compl., Exs. A–D; *Thomas v. John A. Youderian Jr., LLC*, 232 F. Supp. 3d 656, 665 (D.N.J. 2017) ("There is no doubt that Thomas's alleged injury is particularized; it clearly is, because Thomas personally received the Letter, and the debt reported therein is said to be his."). The only question is whether the alleged injury also is concrete. *See Spokeo*, 136 S. Ct at 1548 ("We have made it clear time and time again that an injury in fact must be both concrete *and* particularized."). CBLC argues that the plaintiffs' claims must fail because they "do not allege

that the mere use of the words[] 'Credit Bureau' in CBLC's name harmed them in any way or otherwise caused them to take some action." Def.'s Mem. at 8. But *Spokeo* and *In re Horizon* make clear that a plaintiff need not actually suffer the threatened harm, so long as the plaintiff faced *a risk of real harm*.

The plaintiffs allege that the use of the term "Credit Bureau" in CBLC's name and logo was deceptive, and that deception placed debtors at risk of being "intimidate[d] . . . into thinking that [CBLC] is a powerful institution, has a wealth of private information, and can control sensitive financial data on" debtors. Second Am. Compl. at ¶ 23. The plaintiffs further allege that the use of the name "Credit Bureau" risks deceiving, misleading, or intimidating debtors by suggesting that CBLC "is a credit reporting agency or that his or her account will be reported to the defendant's 'credit bureau.'" *Id.* at ¶ 29. As the plaintiffs explain in their opposition to the summary judgment motion, that deception risks "unfairly induc[ing] the consumer to pay a debt he might not owe, or pay CBLC over another outfit." Mem. in Opp. to Def.'s Mot. for Summ. J. ("Pls.' Opp. Mem.") at 2, Doc. No. 30.[3]

The plaintiffs' allegations satisfy both tenets of the *In re Horizon* rule. First, the alleged deception and intimidation constitute "the very injury the [FDCPA] is intended to prevent." *Jensen*

---

[3] The court recognizes that the plaintiffs do not plead that they personally were deceived or intimidated by the use of the term "credit bureau" in CBLC's name and logo. *See generally* Second Am. Compl. The court considers this to be analogous to the facts in *Thomas*, in which the District of New Jersey deemed it "highly problematic" that the plaintiff did not plead that the alleged deception personally influenced him, and instead alleged "hypothetical injury to third-party [c]onsumers." 232 F. Supp. 3d at 669–70 (quotation marks omitted). In that case, the plaintiff challenged as misleading a debt collector's reference to a $3.00 convenience fee for paying a debt with a credit card, which the plaintiff alleged was "neither authorized by contract or permitted by law." *Id.* at 662. Despite finding that the plaintiff had not alleged he had personally acted in some way because of the reference to a fee, the District of New Jersey held that "there [wa]s barely enough for standing," because

> these are the *kind* of misleading statements which, if sent to a debtor, might give rise to an actionable injury under this statute. Deprivation of the right to be free of false or deceptive debt collection information, with the attendant risk of economic injury, is an interest recognized by statute, and one reasonably rooted in the traditions of common law.

*Id.* at 670–71.

*v. Pressler & Pressler*, 791 F.3d 413, 418 (3d Cir. 2015) (describing FDCPA as "an explicitly remedial statute, passed by Congress 'to eliminate abusive debt collection practices by debt collectors'" (quoting 15 U.S.C. § 1692(e))); *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) ("The FDCPA prohibits the use of deception in the debt-collection process."). The plaintiffs here allege a risk of being deceived, misled, or intimidated by the implication that CBLC is a credit bureau. Second Am. Compl. at ¶ 28. There can be no doubt that such confusion and intimidation is the very harm the FDCPA explicitly aims to prevent.

Second, the plaintiffs' claims have a close relationship to a harm traditionally providing a basis for a lawsuit in English or American courts. *See Carney v. Goldman*, Civ. A. No. 15-260-BRM-DEA, 2016 WL 7408849, at *5 (D.N.J. Dec. 22, 2016) ("Insofar as *Spokeo* directs the Court to consider whether an alleged injury-in-fact 'has traditionally been regarded as providing a basis for a lawsuit,' Congress has long provided plaintiffs with the right to seek redress from debt collectors for the very conduct[, deceptive debt collection practices,] alleged here." (quoting *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 274)); *Thomas*, 232 F. Supp. 3d at 671 ("Deprivation of the right to be free of false or deceptive debt collection information, with the attendant risk of economic injury, is an interest recognized by the statute, and one reasonably rooted in the traditions of the common law."). As the Third Circuit made clear in *Susinno*, the plaintiffs need not demonstrate that they could have prevailed under a common law cause of action; rather, the plaintiffs need only show that the FDCPA protects "essentially the same interests" traditionally protected at common law. 862 F.3d at 351. There can be no doubt that the common law has long reflected an interest in avoiding the harms inherent to receiving misleading information. *See, e.g.*, *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (explaining elements for cause

of action for common law fraud and negligent misrepresentation).  Accordingly, the plaintiffs have

standing to bring this lawsuit.

### C.    Whether CBLC is a Credit Bureau

Having determined that the plaintiffs have standing to pursue their claims, the court turns

now to the question of whether the collection letters were false, deceptive, or misleading under the

FDCPA.  In resolving this question, the court must first consider whether CBLC is, in fact, a credit

bureau.  As there is no statutory definition or controlling case law designating the exact meaning

of the term, the court must also consider the various sources the parties cite in support of their

respective positions.

### 1.    FTC Guidance Does Not Establish that a CRA is a Credit Bureau as a Matter of Law

In support of its argument that it is a credit bureau, CBLC relies heavily on guidance from

the FTC—including both commentary and staff opinion letters—which it argues explicitly allow

any CRA to refer to itself as a credit bureau.  Specifically, CBLC cites to the 1988 Interpretation

Staff Commentary on the Fair Debt Collection Practices Act:

> 1.  *Dual agencies*. The FDCPA does not prohibit a debt collector from operating a
> consumer reporting agency.
>
> 2. M*isleading names*. Only a bona fide consumer reporting agency may use names
> such as "Credit Bureau," "Credit Bureau Collection Agency," "General Credit
> Control," "Credit Bureau Rating, Inc.," or "National Debtors Rating." A debt
> collector's disclaimer in the text of a letter that the debt collector is not affiliated
> with (or employed by) a consumer reporting agency, will not necessarily avoid a
> violation if the collector uses a name that indicates otherwise.
>
> 3. *Factual issue*.  Whether a debt collector that has called itself a credit bureau
> actually qualifies as such is a factual issue, to be decided according to the debt
> collector's actual operation.

Def.'s Mem. at 13 (quoting Statements of General Policy or Interpretation Staff Commentary on

the Fair Debt Collection Practices Act, 53 Fed. Reg. 50097-02, 1988 WL 269068, at *50107 (Dec.

13, 1988)).  CBLC also points to three staff opinion letters that assert essentially the same premise.[4]
*See id.* at 13–14.

The court recognizes that the commentary and the letters contain certain statements that lend credence to CBLC's argument that "CRA" and "credit bureau" are treated synonymously. *See, e.g.*, FTC Ltr. 3 ("The use of these names [containing, among other terms, the term 'credit bureau'] clearly suggest to the consumer that a consumer reporting agency (credit bureau) is contacting the consumer.").  However, taken as a whole, the better reading of the FTC guidance is that an entity that is not a CRA cannot use a name that includes the term "credit bureau," but not necessarily that the inverse also is true.  To put it differently, being a CRA is a necessary, but not a sufficient, condition to an entity being a credit bureau.  It is noteworthy that the commentary specifies that a debt collector's status as a credit bureau—not as a CRA—is a factual issue.  That makes sense, as the FCRA clearly defines the term "CRA" but does not define the term "credit bureau."  If it were true that a CRA is, by definition, a credit bureau, then the third tenet of the commentary would be a nullity; rather than evaluate a debt collector's actual operation when examining whether the debt collector is a credit bureau, one could simply ask whether the debt

---

[4] The most recent of those opinion letters, dated March 6, 2000, states:

> If a debt collector is also a ["]consumer reporting agency," the FDCPA does not prohibit the debt collector from using a company name such as ["]Credit Bureau of _____" to indicate that it is a consumer reporting agency.  Based on your letter, however, it does not appear that your client's business has a consumer reporting agency component.  Thus, the issue is whether your client's use of the proposed company name, ["]Creditor's Bureau of Missoula," when contacting consumers would be a false representation or implication that the company is, at least in part, a consumer reporting agency.  In the Staff Commentary on the FDCPA, Commission staff stated that ["o]nly a bona fide consumer reporting agency may use names such as ["]Credit Bureau," ["]Credit Bureau Collection Agency," ["]General Credit Control," ["]Credit Bureau Rating, Inc.," or ["]National Debtors Rating."  53 Fed. Reg. 50097, 50107 (Dec. 13, 1998).  All five of these company names imply that the company is in the business of reporting credit information to consumers' prospective creditors.

Fed. Trade Comm'n, Staff Opinion Letter on the Fair Debt Collection Practices Act (Mar. 6, 2000), 2000 WL 34500215 (internal footnotes omitted) ("FTC Ltr. 1"); *see also* Fed. Trade Comm'n, Staff Opinion Letter on the Fair Debt Collection Practices Act (Nov. 10, 1992), 1992 WL 12144202 ("FTC Ltr. 2"); Fed. Trade Comm'n, Staff Opinion Letter on the Fair Debt Collection Practices Act (Feb. 21, 1990), 1990 WL 10080960 ("FTC Ltr. 3").

collector operated as a CRA as defined in the FCRA.

The court's interpretation is further supported by the Federal Trade Commission's most recent staff opinion letter from March 6, 2000, which states that company names that include the term "credit bureau" "imply that the company is in the business of reporting credit information to consumers' prospective creditors." FTC Ltr. 1. But the plaintiffs have identified evidence that CBLC only "reports" credit information in the sense that it prepackages credit reports prepared by TransUnion, and there is no dispute that CBLC sells its background screening reports to prospective employers and landlords, not prospective creditors. *See* Pls.' Resp. at ¶ 3; Def.'s Facts at 2.[5]

Even if the FTC Commentary and opinion letters were directly on point, they would not necessarily control the outcome here. In the Third Circuit, FTC guidance may be considered in interpreting the FDCPA to the extent the guidance is persuasive, but it is not binding on the court. *See Brown v. Card Serv. Ctr.*, 464 F.3d 450, 455–56 (3d Cir. 2006) ("FTC Commentary does not have the force of law and is 'not entitled to deference in FDCPA cases except perhaps to the extent [its] logic is persuasive.'" (alteration in original) (quoting *Dutton v. Wolpoff & Abramson*, 5 F.3d 649, 654 (3d Cir. 1993)); *see also Staub v. Harris*, 626 F.2d 275, 279 (3d Cir. 1980) ("[T]he precedential value of the FTC's informal advisory opinion is limited by the restricted interpretive power given to that agency under the FDCPA."). The court does not find the FTC guidance to be persuasive here for the following reasons.

---

[5] The same is true for the Consumer Financial Protection Bureau commentary the defendant cites: "Credit reporting companies, also known as credit bureaus or consumer reporting agencies, collect and store financial data about you that is submitted to them by creditors, such as lenders, credit card companies, and other financial companies." *What is a credit report?*, CONSUMER FINANCIAL PROTECTION BUREAU (last updated June 8, 2017), https://www.consumerfinance.gov/ask-cfpb/what-is-a-credit-report-en-309/. Again, CBLC does not collect information directly from creditors, but instead receives already-compiled credit reports from TransUnion.

First, neither the Commentary nor the opinion letters sought to answer the question of whether a CRA is indistinguishable from a credit bureau. *See* FTC Ltr. 1 (answering whether company that was not CRA could refer to itself as "creditor's bureau"); FTC Ltr. 2 (evaluating whether company was operating as debt collector at all); FTC Ltr. 3 (evaluating whether use of name "Capitol Credit Services, Inc." by non-credit bureau violated FDCPA). Second, each of the opinion letters explicitly states that it is "informal" or "unofficial" and not binding on the FTC itself. *See* FTC Ltr. 1; FTC Ltr. 2; FTC Ltr. 3. Third—and perhaps most importantly—the opinion letters are between 18 and 28 years old. The Commentary the letters are based on is 30 years old. According to the plaintiffs, many smaller, regional consumer reporting agencies—including CBLC—sold their consumer credit reporting divisions to TransUnion, Equifax, or Experian in recent years. A reasonable trier of fact could find that although it may have been accurate at the time the FTC issued the letters to treat CRA's and credit bureaus interchangeably—because many CRA's also played a credit reporting function—that is no longer necessarily the case.

Nor is the court persuaded that CBLC is entitled to the defense provided under 15 U.S.C. § 1692k(e) that it acted "in good faith in conformity with any advisory opinion of the [FTC]."[6] Section 1692k(e) only protects a debt collector that seeks the advisory opinion itself. *Evankavitch v. Green Tree Servicing, LLC*, 793 F.3d 355, 363 (3d Cir. 2015) (holding section 1692k(e) "provides a safe harbor for a debt collector that seeks and receives legal opinions from the Consumer Financial Protection Bureau before they proceed"). It is not at all clear that a debt collector can rely on opinions sought by other parties nearly two decades earlier that do not even

---

[6] Section 1692k(e) technically refers to advisory opinions from the Consumer Financial Protection Bureau. The FTC shares authority with the Consumer Financial Protection Bureau under the Dodd-Frank Wall Street Reform and Consumer Protection Act, and the Supreme Court recognized § 1692k(e)'s applicability to FTC advisory opinions in *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 588 (2010) ("Congress included in the FDCPA not only the bona fide error defense but also a separate protection from liability for 'any act done or omitted in good faith in conformity with any advisory opinion of the [FTC].'" (alteration in original) (quoting 15 U.S.C. § 1692k(e)).

ask the relevant question. Moreover, even if CBLC had sought and relied on an advisory opinion from the FTC in this matter, that would merely insulate CBLC for liability for any past violations; it would not permit CBLC to continue using its current potentially deceptive name if the court found the FTC's logic unpersuasive. To conclude otherwise would leave the court powerless to address the risk that CBLC was misleading debtors such as the plaintiffs in this case.

### 2. Case Law Does Not Establish That CRA's Necessarily are Credit Bureaus as a Matter of Law

CBLC cites to numerous cases holding that a debt collector can refer to itself as a credit bureau when it also is in the business of consumer credit reporting. *See Charles v. Credit Bureau Servs.*, No. Civ. A. 99-1505, 1999 WL 1204839, at *2 (E.D. La. Dec. 15, 1999) ("In circumstances where a business using the name 'credit bureau' operates as both a credit reporting agency and a collection agency, the company does not deceive or mislead consumers in violation of § 1692(e)."); *Byes v. Credit Bureau Enters., Inc.*, Civ. A. No. 95-239, 1996 WL 99360, at *2 (E.D. La. Mar. 6, 1996) ("[T]he undisputed facts show that CBE operates as both a credit reporting agency and a collection agency. A substantial part of its business is related to credit reporting.");[7] *Catherman v. Credit Bureau of Greater Harrisburg*, 634 F. Supp. 693, 695 (E.D. Pa. 1986) (addressing whether collection letter "impermissibly blur[red] the distinction between the Credit Bureau's collecting and reporting divisions"); *Wright v. Credit Bureau of Ga., Inc.*, 555 F. Supp.

---

[7] The court notes that the Eastern District of Louisiana went on to state:

> The mere use of the name "credit bureau" alone cannot reasonably be construed by even the least sophisticated consumer as a deceptive threat that a failure to pay will harm the consumer's credit rating. . . . It seems unlikely that the FDCPA would prohibit only the false use of such a name in subsection (16) if the mere use of the name is a deceptive means to collect a debt.

*Byes*, 1996 WL 99360, at *3. As the Eastern District of Louisiana agreed with the defendant that it truthfully operated as a credit bureau, any language regarding whether an entity inaccurately calling itself a credit bureau would be a material deception is dicta. And even if that language was not dicta, the court would find it unpersuasive, especially considering the significant changes to the consumer reporting industry since 1996.

1005, 1006 (N.D. Ga. 1983) ("[T]he plaintiff argues that the defendant is unfairly using its identity as a credit reporting agency to its advantage in its collection operation . . . ."). All those cases are inapposite here, where a genuine issue of material fact exists as to whether CBLC engages in credit reporting. Again, no one disputes that a debt collector can act as a credit reporting agency; the question is whether the defendant *actually acted as one here*.

CBLC then cites to several cases which it suggests demonstrate that "the term 'credit bureau' has been associated with consumer reporting agencies, like CBLC, that provide background investigations and/or are a 'reseller.'" Def.'s Mem. at 16. But again, none of those cases are relevant to the question at issue here. *See Bakker v. McKinnon*, 152 F.3d 1007, 1012 (8th Cir. 1998) (holding that credit reports are "consumer reports" under FCRA); *Zamora v. Valley Fed. Sav. & Loan Ass'n of Grand Junction*, 811 F.2d 1368, 1369 (10th Cir. 1987) (indicating that defendant "obtained a credit report on plaintiff from the Mesa County Credit Bureau"); *Ocasio v. CoreLogic Credco, LLC*, Civ. No. 14-1585 (NLJ/JS), 2015 WL 5722828, at *1, 2 (D.N.J. Sept. 29, 2015) (referring to Experian, Equifax, and TransUnion as "credit bureaus" and CoreLogic as "reseller"); *Rocha v. Coastal Carolina Neuropsychiatric Crisis Servs., P.A.*, 979 F. Supp. 2d 670, 674–75 (E.D.N.C. 2013) (referencing background consumer report provided to employer and employment contract authorizing disclosure of information to several entities, including credit bureaus); *Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.*, No. 12-61360-CIV, 2012 WL 6102068, at *1 (S.D. Fla. Dec. 7, 2012) (involving antitrust claims not addressing use of term "credit bureau" in plaintiff's name); *Loum v. Houston's Rests., Inc.*, 985 F. Supp. 1315, 1319 (D. Kan. 1997) (referencing Kansas City Credit Bureau reporting plaintiff owed money to prior landlord); *King v. MTA Bridges and Tunnels*, 933 F. Supp. 220, 221 (E.D.N.Y. 1996) (referencing credit bureau receiving credit report from TransUnion and sharing it with defendant); *United States*

*v. Am. Future Sys., Inc.*, 571 F. Supp. 551, 570 (E.D. Pa. 1982) (referring generally to credit-checking process through credit bureau), *aff'd*, 743 F.2d 169 (3d Cir. 1984); *Doe v. Gen. Servs. Admin.*, 544 F. Supp. 530, 532 (D. Md. 1982) (referring to United Credit Bureau investigating plaintiff's employment history); *In re Brevard*, 200 B.R. 836, 839 (Bankr. E.D. Va. 1996) (referencing credit report listing plaintiff's debts). None of these cases set out to answer anything like the question at issue here, and several do not even mention the term "consumer reporting agency."

Other cases that CBLC relies on again demonstrate that a credit bureau is, by definition, a CRA, but not necessarily that the inverse is true. *See Consumer Data Indus. Ass'n v. Swanson*, No. 07-CV-3376 (PJS/JJG), 2007 WL 2219389, at *1 (D. Minn. July 30, 2007) (stating that credit bureaus are "also known as . . . consumer reporting agencies" and defining them as entities that "collect information about consumers' credit experience and resell that information for various purposes"); *Thulin v. EMC Mortg. Corp.*, Civ. No. 06-3514 (RHK/JSM), 2007 WL 3037353, at *2 n.3 ("A credit bureau, in FCRA parlance, is a 'consumer reporting agency.'"); *In re Luchini*, 511 B.R. 664, 677 (Bankr. E.D. Cal. 2014) (referencing "consumer reporting agencies (credit bureaus)"). Again, all of these cases demonstrate that credit bureaus may be referred to as "consumer reporting agencies," but none of them establish that all consumer reporting agencies are credit bureaus. The court in *Consumer Data Industry Ass'n* even defines a credit bureau as an entity that "collects information about consumers' credit experience," which the plaintiffs allege CBLC does not do.

Lastly, CBLC cites United States Magistrate Judge David R. Strawbridge's opinion granting the defendant's motion for partial judgment on the pleadings in *Kelly v. Business Information Group, Inc.* That case addressed credit reporting agencies' obligation under the FCRA

to "'follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.'" Civ. A. No. 15-6668, 2016 WL 7404470, at *2 (E.D. Pa. Dec. 22, 2016) (quoting 15 U.S.C. § 1681e(b)). Throughout the opinion, the court refers interchangeably to consumer reports and credit reports and, in discussing other cases, references the possibility of a credit bureau reporting information unrelated to the consumer's creditworthiness. *See id.* at *4–9. Specifically, the court discusses a 1969 report of the Senate Committee on Banking and Currency that identified the concern the FCRA was meant to address, namely out-of-date information on consumers being reported "such that a credit bureau might publish a record of a suit or arrest without also indicating that the suit was dismissed or charges dropped, putting in jeopardy the consumer's future employment 'because of *an incomplete credit report*." *Id.* at *9 (quoting S. Rep. No. 91-517, at 4 (Nov. 5, 1969)).

Although the defendant relies on *Kelly*, it is inapplicable to this case for the following reasons: First, the court notes that the alternative characterizations of the relevant information as a consumer or credit report appear to arise from the complaint in that action. *See* 2016 WL 7404470, at *2–3 (reciting and summarizing allegations in complaint); *see also* Compl., *Kelly*, Civ. A. No. 15-6668, Doc. No. 1. As the distinction was irrelevant to the merits, it is unsurprising that the court did not attempt to distinguish between the two. Second, although the Committee Report references lawsuits and arrests (which indisputably go beyond a consumer's creditworthiness) being included in a "credit report," that cannot be sufficient to establish that CRA's and credit bureaus are indistinguishable as a matter of law given the myriad of other sources that support a contrary conclusion. Finally, aside from the fact that this is a passing statement in a Committee Report not meant to address the particular question at issue here, the Report is nearly 50 years old,

and therefore cannot possibly be expected to reflect the current reality of the consumer reporting industry.

### 3. The United States Code and the Code of Federal Regulations Offer Contradicting Interpretations as to Whether a CRA is a Credit Bureau

Certainly, CBLC has identified other sources that suggest that "credit bureaus" and "consumer reporting agencies" are treated as equivalent terms in certain circumstances, and a reasonable trier of fact could find that CBLC is, in fact, a credit bureau. In this regard, both 42 U.S.C. § 666(7) (concerning child support) and 7 C.F.R. § 3560.154(h) (concerning tenant selection) suggest that the terms can be used interchangeably. Moreover, 31 C.F.R. § 29.502, published by the Department of Treasury, specifies that "credit bureau" has the same definition as "consumer reporting agency" in 31 U.S.C. § 3701(a)(3), which in turn adopts the definition of "consumer reporting agency" under the FCRA.

On the other hand, 15 U.S.C. § 1679c states, "'You have a right to obtain a copy of your credit report from a credit bureau.'" The Federal Reserve's Guide on Credit Reports and Credit Scores similarly states, "You can get a free credit report from th[e] credit bureau [which provided a credit report used to make a decision related to a denial of credit, insurance, or employment—or is used to take some other adverse action against you] if you request it within sixty days after receiving the notice. This free report is in addition to your annual free report." *Credit Reports and Credit Scores*, Board of Governors of the Federal Reserve System, https://www.federalreserve.gov/creditreports/pdf/credit_reports_scores_2.pdf. The plaintiffs have referred to evidence demonstrating that CBLC does not provide those credit reports. *See* Pls.' Add'l Facts at ¶ 29. Considering the contradictory interpretations between these and the other sources discussed, the court cannot conclude that there is no genuine issue of disputable fact here.

4. **Pennsylvania Law Does Not Establish That a CRA is a Credit Bureau as a Matter of Law**

Pennsylvania's Administrative Code defines a "consumer credit bureau" as "[a] consumer reporting agency that collects information from creditors, lenders, debt collection agencies and the courts on an individual's borrowing and bill payment habits." 58 Pa. Code § 609a.1.[8] But the factual record does not suggest that CBLC does any of those things. To the contrary, CBLC merely purchases that information from TransUnion. *See* Pls.' Opp. Mem., Ex. A, Apr. 30, 2018 Dep. of Kelly Lutz, at 65:6–14, Doc. No. 30-2. In any event, CBLC has not established that Pennsylvania law—or any other state law—should control how a term is interpreted under the FDCPA, a federal statute.[9]

5. **The Plaintiffs' Counsel's Statements in a Prior Action Do Not Establish That a CRA is a Credit Bureau as a Matter of Law**

The final source CBLC cites is *Durr v. Rochester Credit Center, Inc.*, No. 09-4232, 2012 WL 2130953 (E.D. Pa. June 5, 2012), an action the plaintiffs' counsel previously filed in which the complaint included the statement, "'credit bureau' is synonymous with consumer reporting agencies." Def.'s Mem., Ex. C, Doc. No. 26-6. *Durr*, however, is not analogous to this case because the plaintiff in *Durr* alleged that the defendant was not a CRA at all, not that the defendant was a CRA but not a credit bureau. *Id.* The court recognizes that the plaintiffs' counsel's language in the *Durr* complaint unfortunately is imprecise. Nonetheless, like the FTC commentary, the best reading of the complaint is that an entity that is not a CRA cannot be a credit bureau, not necessarily

---

[8] This section is in the part of the Administrative Code applying to the Gaming Control Board and this definition is in the section applicable to table games.

[9] CBLC claims that state laws "consistently" treat credit bureaus and CRA's synonymously, but only cites to Pennsylvania, Texas, and New Mexico statutes. If anything, New Mexico's law suggests that CBLC is not even a CRA, which it defines as an entity engaged in *credit* reporting. *See* N.M. Stat. Ann. § 56-3A-2(B) (defining "consumer reporting agency" as "any person that, for monetary fees, dues or on a cooperative nonprofit basis, regularly engages in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing *credit reports* to third parties" (emphasis added)).

that an entity that is a CRA always is a credit bureau. The court also notes that language elsewhere in the complaint makes clear that a credit bureau specifically reports on consumer credit information, and not just "other information on consumers." *Id*. at 3 ("A 'Credit Bureau' is commonly understood to be an agency that assembles credit histories and produces credit reports, i.e., a consumer reporting agency."). Here, the plaintiffs allege that CBLC does not assemble credit histories and produce credit reports; instead, it relies on TransUnion to do so. Therefore, considering the facts in the light most favorable to the plaintiffs, CBLC does not meet the plaintiffs' counsel's definition of "credit bureau," as stated in the *Durr* complaint. And even if it did, it is not at all clear that those representations would establish any sort of binding definition of the term "credit bureau."

The court also notes that CBLC misstates the holding in *Durr*. CBLC cites *Durr* for the proposition that, "courts have only found concern with a debt collector using the words 'credit bureau' in its name in circumstances when the agency does not also actually operate as a consumer reporting agency." Def.'s Mem. at 16 (citing *Durr*, 2012 WL 2130953, at *1). But the very quote that CBLC cites from *Durr* makes clear that its interpretation goes too far:

> While a division of RCC was a credit reporting agency in prior years, defendants were aware that RCC had divested its credit reporting business before 2000. In February 2009, at the time at issue, RCC was engaged only in debt collection and was not engaged in any form of *credit reporting*.

*Id*. (emphasis added) (quoting 2012 WL 2130953, at *1). Again, CBLC has not demonstrated that merely repackaging credit reports received from TransUnion amounts to "credit reporting."

### D. Whether the Use of the Term "Credit Bureau" in CBLC's Name is Misleading or Deceptive

The FDCPA prohibits the use of any "false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. An FDCPA plaintiff

cannot succeed merely by demonstrating that the relevant collection letter contained some falsehood. *See Jensen*, 791 F.3d at 420. Rather, the plaintiff must show that the falsehood actually threatened to deceive or mislead. *See id*. at 420–21. In determining whether the purportedly problematic statement is deceptive or misleading, courts consider the perspective of the "least sophisticated debtor." *Id*. ("'[I]f a statement would not mislead the unsophisticated consumer, it does not violate the [FDCPA]—even if it is false in some technical sense.'" (quoting *Hahn v. Triumph Partnerships LLC*, 557 F.3d 755, 758 (7th Cir. 2009)). The least sophisticated debtor standard is consistent with the broad construction appropriate in interpreting a remedial statute, like the FDCPA. *See Brown*, 464 F.3d at 453 ("Because the FDCPA is a remedial statute, we construe its language broadly, so as to effect its purpose." (internal citation omitted)).

That said, the least sophisticated debtor standard "'prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care.'" *Wilson v. Quadramed Corp.*, 225 F.3d 350, 354–55 (3d Cir. 2000) (quoting *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 136 (4th Cir. 1996)). "The standard is an objective one, meaning that the specific plaintiff need not prove that *she* was actually confused or misled, only that the objective least sophisticated debtor would be." *Jensen*, 791 F.3d at 419 (citing *Pollard v. Law Office of Mandy L. Spaulding*, 766 F.3d 98, 103 (1st Cir. 2014) and *Bentley v. Great Lakes Collection Bureau*, 6 F.3d 60, 62 (2d Cir. 1993)). A collection letter risks deception "'when it can be reasonably read to have two or more different meanings, one of which is inaccurate.'" *Wilson*, 225 F.3d at 354 (quoting *Russell v. Equifax A.R.S.*, 74 F.3d 30, 35 (2d Cir. 1996)). The use of certain letterhead can also be deceptive or misleading within the meaning of the FDCPA. *See Lesher v. Law Offices of Mitchell N. Kay, PC*, 650 F.3d 993, 1003 (3d Cir. 2011) (holding that use of law firm letterhead

on collection letters could cause least sophisticated debtor to "reasonably believe that an attorney has reviewed his file and has determined that he is a candidate for legal action").

Having concluded that there is a genuine issue of material fact as to whether CBLC is a credit bureau, the court also finds that there is a genuine issue of material fact as to whether the logo on the collection letters would mislead the least sophisticated debtor. The plaintiffs ask the court to make a fairly common-sense conclusion: any recipient of the collection letters would assume that CBLC would not call itself a credit bureau if it were not one. Certainly, the court would not expect the least sophisticated debtor to know the history of TransUnion's, Experian's, and Equifax's acquisitions of smaller regional credit unions over the past two decades and how that impacted CBLC's own business.[10] It is entirely possible—if not likely—that the least sophisticated debtor, upon seeing the logo in the collection letter, would assume that the entity seeking to collect his debt is affiliated with a credit bureau with the power to affect his credit or report the debt to his creditors.

Moreover, there is sufficient evidence to find the possible deception to be material. If a debtor believes that a debt collector also operates as a credit bureau that can unilaterally adjust the debtor's credit history and score and potentially report those changes to creditors, that debtor may very well be more likely to pay the debt quickly, rather than pursue potential avenues of disputing the debt. This possibility is underscored by an expert declaration from the *Durr* case, which CBLC

---

[10] It is worth noting that CBLC's own witnesses recognize that to be the case. In a Rule 30(b)(6) deposition, a CBLC employee agreed that she would expect a consumer to be deceived or misled if a debt collector that only engaged in collections and was not a credit bureau used the term "credit bureau" in its name. *See* Pls.' Opp. Mem., Ex. K, June 12, 2017 Dep. of Kelly Lutz, at 50:4–19, Doc. No. 30-12. In a later deposition, the same witness agreed that it was possible that a consumer who received the relevant collection letters would believe they were "dealing with an outfit that is a . . . 'Credit Bureau.'" *Id.*, Ex. A, Apr. 30, 2018 Dep. of Kelly Lutz, at 42:22–43:1, Doc. No. 30-2. Another Rule 30(b)(6) deponent, CBLC's Executive Director of the Collections Division, testified that a consumer who received the collection letters at issue in this case could believe it came from a credit bureau. *Id.*, Ex. J, June 12, 2017 Dep. of Donna Nicholson Stief, at 86:14–22, Doc. No. 30-11. Thus, by CBLC's own admissions, the collection letters could be "reasonably read to have two or more different meanings," one of which is that the company is a credit bureau.

appended to its summary judgment motion:[11]  "The importance of credit bureaus is underscored by the fact that credit bureaus receive information on consumers' payments histories – both negative and positive – from nearly all major creditors and collectors, and then sell that information in the form of credit reports to nearly all major creditors."  Def.'s Mem., Ex. D, Decl. of Evan Hendricks in *Durr*, No. 09-4232, at ¶ 6, Doc. No. 26-7.  A credit bureau's ability to secure information about virtually all aspects of consumers' financial lives and then share that information in ways that could impact their ability to secure credit, get a job, or purchase a home is a powerful consideration that any debtor, let alone an unsophisticated one, is unlikely to ignore.  In light of those considerations, the court is not prepared to conclude that any potential deception would be immaterial.

In addition, the collection letters' disclosure that the plaintiffs' accounts were referred to CBLC solely for collection purposes does not defeat the plaintiffs' claims at this stage.  In support of its argument that this disclosure negates the plaintiffs' claims, CBLC cites to *Catherman*, 634 F. Supp. at 693 in which the court held "'there [wa]s no inherent misrepresentation in [the collection letter] speaking of the Credit Bureau as one entity, encompassing both divisions.'"  Def.'s Mem. at 24 (quoting *Catherman*, 634 F. Supp. at 695).  But in that case, there was no dispute that at least part of the company *acted as a credit bureau*.  The facts here are more analogous to those in *Lesher* because in that case, the Third Circuit agreed with the district court that a law firm's disclosure that "an attorney had not reviewed [the plaintiff's] account" was inadequate to mitigate the law firm letterhead's implication that the plaintiff's debts were the subject of potential

---

[11] The court notes that the plaintiffs appended an expert report from Mr. Hendricks to their opposition to CBLC's motion for summary judgment in this case.  See Pls.' Opp. Mem., Ex. N, May 31, 2018 Rep. of Evan Hendricks, Doc. No. 30-15.  CBLC argues that the court should disregard this report as an "erroneous legal opinion."  Def.'s Reply in Further Support of its Summ. J. Mot. at 3 ("Def.'s Reply"), Doc. No. 31.  CBLC also filed a separate motion to exclude Mr. Henricks's report.  Def.'s Mot. to Exclude Expert Witness Rep. of Evan Hendricks, Doc. No. 32.  As the court considers Mr. Hendricks's report unnecessary to deny the motion, the court need not rule at this time on whether Mr. Hendricks's report is proper.

legal action.  650 F.3d at 1002–03.  The Third Circuit relied on two factors in coming to that conclusion: (1) the statement that no attorney had reviewed the debt contradicted the message in the letter that the law firm had been retained to collect the debt, and (2) the statement that the letters were "from a debt collector" were statutorily required and could not be viewed as "nullifying any implication that the letter [wa]s from an attorney" because "the categories of 'debt collector' and 'attorney' are not mutually exclusive."  *Id.* at 1003 (quoting *Rosenau*, 539 F.3d at 223 ).[12]

Similarly, the categories of "debt collector" and "credit bureau" are not mutually exclusive. Indeed, that is the heart of CBLC's argument – that it is both a debt collector and a credit bureau. Like the disclosure at issue in *Lesher*, CBLC's disclosure that it was acting as a debt collector would not mitigate the risk that the least sophisticated debtor would interpret CBLC's name as suggesting that the debt potentially subjected the debtor to adverse action from a credit bureau.  In the same way that the *Lesher* plaintiffs could have believed both that they were dealing with a collection agency and that their debts had been the subject of attorney review, recipients of the letters here could believe that CBLC both acted as a collections agency as to their debts and had the unilateral ability to incorporate those debts into their credit scores or reports.

---

[12] CBLC attempts to distinguish *Lesher* by claiming that "CBLC's letter does not make any false representation." Def.'s Reply at 5.  But *Lesher* did not involve a false representation either.  Rather, as CBLC itself acknowledges, it involved the false *implication* that an attorney was involved in a legal capacity concerning the debt.  *See* Def.'s Reply at 5 (quoting *Lesher* for statement that the letters "falsely imply that an attorney, acting as an attorney, is involved in collecting Lesher's debt").  Likewise, here the name "Credit Bureau of Lancaster County" implies that CBLC is a credit bureau.

CBLC correctly notes that the Third Circuit did "not decide [in *Lesher*] whether an attorney debt-collector who sends out a collection letter on attorney letterhead might, under appropriate circumstances, comply with the strictures of the Act by including language that makes clear that the attorney was not, at the time of the letter's transmission, acting in any legal capacity." *Id.* But the equivalent here would have been if CBLC had expressly stated in the collection letters that it was acting *solely* as a debt collector and not as a credit bureau in regards to the plaintiffs' debts.  Instead, the collection letters only stated, "This creditor listed above has placed your account with our office for collection."  Pls.' Opp. Mem., Ex. D, Doc. No. 30-5.

## IV. CONCLUSION

After careful review of the parties' filings and the evidence submitted, the court concludes that the plaintiffs have Article III standing to pursue their claims, and a genuine issue of material fact exists as to whether CBLC is, in fact, a credit bureau. If the trier of fact determines that CBLC is not a credit bureau, a genuine issue of material fact exists as to whether its logo rendered the collection letters the plaintiffs received materially deceptive or misleading under 15 U.S.C. § 1692(e). Therefore, the court will deny CBLC's motion for summary judgment.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.